UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON CIANCIOTTO, on behalf of his minor son D.S.,

Plaintiff,

-v-

NEW YORK CITY DEPARTMENT OF EDUCATION;
BOARD OF EDUCATION OF THE CITY OF NEW
YORK; BRIDGET EDWARDS; ERIKKA SHARPE;
PETER BLOCH; ERIN LALOR; ALEXANDER
ANGUEIRA; and CYNTHIA KERNS,

Defendants.

21 Civ. 5596 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Jason Cianciotto, on behalf of his minor son, D.S., who is disabled, brings this

action against the New York City Department of Education ("DOE"), the Board of Education of

the City of New York ("BOE"), and numerous teachers and administrators ("individual

defendants") (collectively, "defendants") at D.S.'s former middle school, Intermediate School

126Q ("I.S. 126Q"). Against DOE and BOE alone, Cianciotto brings claims under Title IX of

the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and Section 504 of

the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794. Against the individual

defendants alone, Cianciotto brings claims under New York Civil Rights Law §§ 40-c and 40-d.

Against all defendants, Cianciotto brings claims under the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*, the New York City Human Rights Law

("NYCHRL"), N.Y. City Admin. Code §§ 8-101 *et seq.*, and of common law negligence. The

claims arise out of an incessant barrage of bullying D.S. allegedly faced from other students at

I.S. 126Q on account of his sexuality and gender expression, and the school's alleged failure to

meaningfully address it. As alleged, that bullying resulted in, *inter alia*, the denial to D.S. of a

free and appropriate public education. Pending before the Court is defendants' motion to dismiss. For the reasons below, the Court denies the motion in full.

I.      **Background**

    A.      **Factual Background[1]**

        1.      **The Parties**

D.S. is a 15-year-old male student who attended I.S. 126Q during the 2017–2018 and 2018–2019 school years, during which periods D.S. was a sixth and seventh grader, respectively. AC ¶ 26. D.S. is gay, and his gender expression "does not conform to stereotypes for adolescent boys"—he "loves the color pink and has a strong interest in drag and drag queens." *Id.* ¶¶ 55–56, 62. He also suffers numerous disabilities, which are reviewed below. D.S. is represented here by his father, Jason Cianciotto.

The BOE is a public corporate entity created by state law. It is charged with overseeing the City School District of the City of New York ("School District"). *Id.* ¶ 27.

The DOE was created by the BOE to act as the governance structure for the District. *Id.* ¶ 29. Every individual defendant, named below, is a DOE employee. *Id.*

Bridget Edwards served as Sixth Grade Dean at I.S. 126Q during the 2017–2018 school year. *Id.* ¶ 32.

---

[1] This factual account is drawn from the Amended Complaint, Dkt. 42 ("AC"), and the exhibits it incorporates by reference, which include D.S.'s IDEA Due Process Complaint, Dkt. 35, Ex. B, and the Findings of Fact and Decision of Impartial Hearing Officer Mindy G. Wolman, *id.*, Ex. A ("IHO Decision"). *See Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[A] complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"). Because the Court considers only such facts in rendering judgment, it rejects as moot defendants' argument that Cianciotto has improperly attempted in his opposition brief to "bolster" the AC with facts not stated therein. *See* Dkt. 38 at 1.

At all relevant times at I.S. 126Q, Erikka Sharpe served as Dean of Students, *id.* ¶ 33; Peter Bloch served as Seventh Grade Dean, *id.* ¶ 34; Erin Lalor served as Assistant Principal, *id.* ¶ 35; Alexander Angueira served as Principal, *id.* ¶ 36; and Cynthia Kerns served as a Special Education Teacher, *id.* ¶ 37.

### 2. D.S.'s Background and Disabilities

D.S. spent his early years in Colorado under the care of his biological parents, each of whom was an alcoholic and suffered from drug addiction. *Id.* ¶ 40. From a young age, D.S. was the victim of abuse and neglect, traumatized by witnessing domestic violence between those parents. *Id.* When he was approximately 7 years old, D.S. was removed from his biological parents' home and placed in the Colorado child protective system. *Id.* ¶ 41. Over the next four years, D.S. was placed in seven different foster homes. *Id.* ¶ 42.

At age 10, D.S. was diagnosed with a malignant brain tumor. *Id.* ¶ 43. D.S.'s then-foster parent abandoned D.S. at the hospital after learning of the tumor. *Id.* ¶ 44. Although D.S. had surgery to remove the tumor, he continues to need follow-up care to monitor for its potential recurrence and control seizures. *Id.* ¶ 45. D.S. has been diagnosed with post-traumatic stress disorder, ("PTSD"), generalized anxiety disorder, epilepsy, and various learning disabilities. *Id.* ¶ 46. As reviewed below, D.S., as a result of his disabilities, at all relevant times has been on an individualized education program ("IEP").

In 2017, when D.S. was approximately 11 years old, he entered the care of Jason Cianciotto and his husband, Courter Simmons. *Id.* ¶ 48. On May 22, 2018, Cianciotto and Simmons formally adopted D.S. *Id.* ¶ 49. The family resides in Queens, New York. *Id.*

### 3.    Bullying D.S. Experienced at I.S. 126Q

#### a.    *D.S.'s sixth grade year*

In September 2017, Cianciotto and Simmons enrolled D.S. in the sixth grade at I.S. 126Q in Long Island City, Queens, New York.[2]  *Id.* ¶ 50.  Shortly after he enrolled, D.S. came out to his teachers and classmates as gay, and spoke openly at school about the fact that he was being adopted by two married gay men.  *Id.* ¶¶ 55–56.

Within weeks, D.S. became the target of a campaign of sex- and gender-based bullying from his classmates.  The AC alleges that "[m]ultiple times every week, students at I.S. 126Q openly mocked, taunted, and harassed D.S. on the basis of his sexual orientation and gender expression."  *Id.* ¶ 59.  Students told D.S. that being gay "made him gross, that his dads were disgusting, and that his family was 'wrong' in the eyes of God."  *Id.* ¶ 60.  They also called D.S. derogatory names, including "fag," "faggot," and "homo," and referred to him as "the gay kid" and "gay boy."  *Id.* ¶ 61.  D.S. was bullied and mocked for behaving "like a girl."  *Id.* ¶ 63. Friends D.S. made were themselves the target of bullying by other students, who would spread rumors that D.S.'s male friends were his boyfriends or had kissed him.  *Id.* ¶ 68.  Unsurprisingly, D.S. largely kept to himself due to the bullying and social isolation he faced at school.  These

---

[2] The facts underlying this lawsuit occurred primarily at I.S. 126Q, which is not within this District.  Venue is nonetheless proper, as all individual defendants appear to reside in New York State, and BOE and DOE reside in this District within the meaning of 28 U.S.C. § 1391(c)(2). *See Rankel v. Kabateck*, No. 12 Civ. 216 (VB), 2013 WL 7161687, at *3 (S.D.N.Y. Dec. 9, 2013); *Frederick Goldman, Inc. v. Commemorative Brands, Inc.*, No. 04 Civ. 1100 (LTS), 2004 WL 954692, at *1 (S.D.N.Y. May 5, 2004) (deeming defendant corporation a "resident" under Section 1391(c)(2) where defendant failed to object to personal jurisdiction, thus waiving it).

feelings manifested, for instance, as fear and discomfort at the prospect of eating with classmates at lunchtime. *Id.* ¶ 71.[3]

The AC alleges that school officials were aware of much of the bullying D.S. faced in sixth grade. For example, on or about December 22, 2017, D.S. reported to Dean Edwards an incident in which another student grabbed the hat off D.S.'s head and smacked him, prompting a scuffle that resulted in D.S. crying and running away. *Id.* ¶ 64. Defendants "failed to respond adequately to keep [D.S.] safe." *Id.* ¶ 65. In January 2018, during a science class taught by teacher Emily McFadden, another student told D.S.—in McFadden's presence—that his dads were "shit" and a "mistake created by Jesus" because they are gay. *Id.* ¶ 66. McFadden allegedly failed to report the incident. *Id.* Also made within earshot of I.S. 126Q teachers—which they failed to report—were comments from students that it was "so sad" that D.S. had two dads and that he "should have a mom." *Id.* ¶ 67. Much of the alleged bullying D.S. experienced occurred during class time, meaning he spent much of each day with his tormentors. *Id.* ¶ 69.

Early in the sixth-grade school year, D.S.'s parents met with Dean Edwards to discuss the bullying. Dean Edwards stated that it was "inappropriate for D.S. to talk about his sexual orientation at school," and that "if D.S. did not insist on speaking so openly about his sexual orientation, he would not be subjected to such constant bullying." *Id.* ¶ 73. The AC alleges, upon information and belief, that the school "took no steps as a result of this meeting to protect D.S. from further bullying." *Id.* ¶ 74.

The bullying continued. On an unspecified date, one of D.S.'s classmates (who was a primary perpetrator of the bullying) physically assaulted him, pushing him to the floor. *Id.* ¶ 76.

---

[3] In response to these concerns, school administration proposed that D.S. eat at a table with Dean Edwards, isolated from the rest of the students in the cafeteria. AC ¶ 71.

Just as the student nearly punched D.S., a school official intervened to prevent further escalation. *Id.* In response, D.S. participated in a "mediation" with the other student—the only remedial action the school took in response to the incident. *Id.* ¶ 77. The AC alleges that the mediation did not prove effective in stopping the bullying.

On or about March 19, 2018, while D.S. was using stress balls to calm himself during class, another student taunted D.S., telling him to "squish those balls." *Id.* ¶ 78. A guidance counselor documented the incident in a DOE incident log[4] and requested that staff "look into" the incident. *Id.* On or about June 1, 2018, one of D.S.'s teachers noted in a DOE incident log that a classmate was "bothering" D.S. and another student, and asked that the Dean "speak to" the offending student. *Id.* ¶ 79. The school did not take further action in response to either incident. *Id.* ¶¶ 78–79. On "multiple occasions during sixth grade," D.S.'s teachers noted in DOE incident logs that D.S. had made remarks in class about wanting to die. *Id.* ¶ 80.

      *b.*    *D.S.'s seventh grade year*

D.S. continued to be bullied in his seventh grade year at I.S. 126Q. On or about September 14, 2018, in response to D.S.'s asking another student about their dancing in the cafeteria, the student called D.S. a "faggot" multiple times. *Id.* ¶ 82. Stephen Linardic, an Assistant Principal at I.S. 126Q, investigated the incident and concluded that D.S. had been subject to bias-based harassment—but the school did not take remedial action. *Id.* ¶ 83.

On October 18, 2018, D.S. informed Assistant Principal Linardic that a student called him a "faggot ass" earlier that day in a school stairwell. *Id.* ¶ 84. Erikka Sharpe, then I.S. 126Q's Dean of Students, found—without explanation—the allegation unsubstantiated. *Id.* ¶ 85. A few days later, on October 22, 2018, one of D.S.'s friends told their science teacher that

---

[4] Incidents are reported on DOE's Online Occurrence Reporting System ("OORS"). AC ¶ 31.

another student in the class called D.S. a "faggot" and antagonized the friend for his friendship

with D.S. *Id.* ¶ 86. The teacher, Jackson Earlean, reported in a DOE incident log that another

student had threatened to beat up D.S. and that the two needed "serious mediation to deal with"

their issues. *Id.* ¶ 87. The log included a note to the school's Seventh Grade Discipline Team

that read, "PLEASE HELP!!!" *Id.* Peter Bloch, then Seventh Grade Dean, investigated the

incident and determined that a student called D.S. a "bitch" and that another student called D.S. a

"pussy dick sucking face." *Id.* ¶ 88. Bloch concluded, however, that the offending student (it is

unclear which one) "was reacting to what [D.S.] had said to him earlier" and therefore that bias-

based harassment had not occurred. *Id.* ¶ 89. The school did not take further action. *Id.*

The AC alleges that, apart from the bullying D.S. faced from his classmates, I.S. 126Q's

faculty and administrators themselves discriminated against D.S. due to his sexual orientation.

In support, Cianciotto points, in part, to "adult leaders'" aversion to a Gay-Straight Alliance

("GSA") club D.S. wished to form for students at the school. *Id.* ¶ 103. On or about October 25,

2018, Cianciotto attended a "Diversity Town Hall" at I.S. 126Q hosted by Principal Angueira.

*Id.* ¶ 104. During the event, Cianciotto asked Angueira about the school forming a GSA; in

response, Angueira stated that the school would not do so "because of concerns that parents of

students from traditional religious backgrounds might find the concept offensive." *Id.* ¶ 106.

Back in the classroom just a few days later, on or about October 30, 2018, one of D.S.'s

classmates called out "faggot" while D.S. was having a disagreement with other students in

class. *Id.* ¶ 90. When D.S. confronted the student he believed called out the slur, the student

called D.S. a "faggot" directly to his face. *Id.* Dean Sharpe investigated the incident, but

concluded that (1) the student who had called out "faggot" had not intended to direct the slur at

D.S., and (2) the student who called D.S. a "faggot" directly had not subjected D.S. to bias-based harassment, because the student lacked "any contextual relationship to the term." *Id.* ¶ 91.

The bullying continued into the winter. On or about November 29, 2018, a classmate told D.S. to "shut up" and "began insulting D.S. and his dads." *Id.* ¶ 94. On December 4, 2018, D.S. "became upset when other students began openly mocking his pronunciation of words he was reading," in response to which the teacher called and left a message for Cianciotto but otherwise did not take action. *Id.* ¶ 95. On or about December 13, 2018, D.S. reported to Dean Sharpe that another student called him a "faggot" as he was leaving the auditorium, and that the student said, "Oh look, there's a faggot" as D.S. passed by. *Id.* ¶ 96. That same student, D.S. informed Dean Sharpe, had called him a "faggot" the previous month while he attended an after-school program at the school. *Id.* ¶ 97. On that occasion, the student had been throwing pencils at D.S.; when D.S. threw a pencil back, the student said, in sum and substance: "'Hey you little faggot. You are messing with the wrong n---a.'" *Id.* During a "mediation" Dean Sharpe conducted between the students, the initial aggressor admitted to calling D.S. a "faggot," apparently out of frustration that D.S. "tattled" on him about an unrelated incident. *Id.* ¶ 98. Dean Sharpe wrote in her notes that D.S. "admitted that his behavior can often be seen as instigating or provoking a situation between himself and his peer[s]." *Id.* Dean Sharpe concluded again that bias-based harassment or bullying had not occurred, because being called a "faggot" did "not constitute a material incident that creates a severe and hostile environment for D.S." *Id.* ¶ 100.

Cianciotto continued to urge the school to support a GSA in the new year. On January 17, 2019, during a meeting between Cianciotto and Linardic about how the school could

disseminate information to interested students about attending DOE's annual GSA Summit,[5] Cianciotto told Linardic that denying D.S.'s request to form a GSA would be unlawful. In response, Linardic mused whether a general "Diversity Club" could be formed instead to avoid offending students and parents. A GSA club was not formed. *Id.* ¶¶ 108–09.

Also on or about January 17, 2019, D.S. was giving a presentation about current events in his Social Studies class, the topic of which was the State's passage of the Gender Expression Non-Discrimination Act ("GENDA") and legislation banning conversion therapy. *Id.* ¶ 110. After D.S. mentioned that GENDA was personally meaningful to him because he has an uncle who is transgender, his teacher, Cynthia Kerns, interrupted and cut off his presentation on the ground that it was "too personal." *Id.* ¶ 111. In response to an email Cianciotto wrote Kerns about the incident, Kerns wrote, "During current events we do steer students away from personal conversations." *Id.* ¶ 112.

The next day, January 18, 2019, Cianciotto emailed Jared Fox, an LGBT Community Liaison for DOE, to inform him of Kerns's interrupting D.S.'s presentation, Cianciotto's meeting with Linardic, and the fact that other students were harassing D.S.'s friends by asking whether they were gay or D.S.'s boyfriends. *Id.* ¶ 113. In response, Fox wrote that the Kerns incident "shouldn't have happened" and that:

> Not allowing a child to finish reading their current events essay because of the topic of sexual orientation could be perceived as discrimination. This, in addition to the staff not allowing [D.S.] to start a GSA and instead steering him towards a diversity club, shows to me a repeated pattern of staff members who are intervening [sic] in what can be perceived as discrimination or harassment. Treating [D.S.] differently because he is gay, has two dads, or because of the perceived religious bias is unacceptable. . . . For this reason, I am including Matthew Riordan. Matthew is the Deputy Executive Director for our [DOE's] Office of Equal Opportunity.

---

[5] The GSA Summit is an event at which students and faculty advisors from GSA clubs at schools throughout the DOE system meet and network with one another. AC ¶ 108.

*Id.* ¶ 114.

In that same email, Fox urged Cianciotto to file a complaint with DOE's Office of Equal Opportunity ("OEO"), noting: "I am required to inform [OEO] if I believe the conduct crosses the line to bullying or harassment by staff members." *Id.* ¶ 115.  Fox urged Riordan to "forward[] for intake" Cianciotto's concerns, noting, "I have done staff training at the school and it seems to me that some of the messages still haven't sunk in to the level they need to." *Id.*

Before Riordan replied, additional incidents occurred.  On or about January 24, 2019, a student told D.S. about a rumor that D.S. had supposedly made comments to peers about a classmate having "a big dick," and then shoved D.S. from behind after he tried to walk away. *Id.* ¶ 127.  D.S. reported the incident to Dean Sharpe, who investigated and again concluded that bias-based harassment had not occurred. *Id.* ¶ 128.  And on or about January 30, 2019, D.S. complained to a teacher that students were whispering about him, laughing at him, and putting their middle fingers up at him during class. *Id.* ¶ 129.

On January 29, 2019, Riordan finally responded to Cianciotto's email, stating, "We will intake [D.S.]'s complaint.  At this point we do not need anything further from either of you but the investigator will reach out as necessary." *Id.* ¶ 116.  On February 5, 2019, Riordan followed up with D.S.'s parents to arrange an interview with an investigator from OEO. *Id.* ¶ 117.  Cianciotto promptly responded, granting approval for the interview and providing scheduling information. *Id.*

On February 9, 2019, Cianciotto emailed Dean Sharpe and Assistant Principal Erin Lalor, asking to meet with them about D.S.'s troubles at school. *Id.* ¶ 130.  The email stated:

> [The purpose of the meeting is] to discuss and determine solutions for the continued classroom environment that negatively affects [D.S.]'s emotional stability and learning. . . . This past Friday capped off yet another week where [D.S.] missed class several times to meet with school counselors because of incidents that

10

> occurred while he was in class.  These experiences echo throughout the week and
> [a]ffect his health through lack of sleep and increased anxiety, especially about
> going back to school the next day.

*Id.* ¶ 131.  On February 12, 2019, Cianciotto met with Sharpe and Lalor.  There, Cianciotto

raised concerns that D.S. was experiencing behavioral issues and feeling anxious about coming

to school due to bias-based bullying.  *Id.* ¶ 133.  In response, administrators suggested addressing

the bullying by asking the English and Language Arts teacher "to weave in appropriate behavior

(respect) in her lessons."  *Id.* ¶ 134.  They also noted that the meeting focused on the "possibility

that [D.S.] may also think students are talking about him when they are not."  *Id.* ¶ 135.  The

school did not take any steps as a result of the meeting to protect D.S. from bullying.  *Id.* ¶ 136.

On March 5, 2019, Cianciotto followed up with Riordan to again request an interview

with OEO.  *Id.* ¶ 118.  On March 7, 2019, Riordan responded, stating that an investigator had

been assigned and would be following up by telephone.  *Id.* ¶ 119.  On March 8, 2019, the

assigned investigator, Susan Lee, scheduled an interview with D.S., which took place on March

12, 2019.  *Id.* ¶ 120.  The AC alleges, upon information and belief, that Lee concluded that the

conduct of I.S. 126Q did not violate DOE policy, and that many of the instances of bullying and

harassment discussed during the interview fell outside OEO's purview because they involved

harassment by students rather than by DOE employees.[6]  *Id.* ¶¶ 121–22.  On March 18, 2019,

Lee emailed another DOE official, Mark Rampersant, referring the incidents to his office "for

any action" he deemed "fit and appropriate."  *Id.* ¶ 123.  Rampersant responded, "We will

address accordingly"; however, the AC alleges, "no further investigation of or corrective

response occurred."  *Id.* ¶¶ 124–25.

---

[6] The AC alleges, upon information and belief, that the incidents comprise the six incidents that
Dean Bloch formally logged on May 13, 2019.  *See* AC ¶¶ 170–72; *infra* p. 15.

On March 12, 2019—the same day D.S. spoke with investigator Lee—D.S. confided in another student that a particular classmate constantly bullied him.  The student about whom D.S. was speaking overheard the comment, and confronted D.S. by asking if he had "a problem." *Id.* ¶ 137.  D.S. told the student, "You never stop picking on me because you're homophobic," in response to which the student told D.S. that she disliked him because D.S. acted "more like a girl" than she did.  *Id.*  Cianciotto reported the incident to Dean Sharpe by email, explaining that the comment was part of a practice of hurtful bias-based speech from that student, dating back to the prior year.  *Id.* ¶ 138.

Dean Sharpe investigated the incident, and spoke with I.S. 126Q's guidance counselor, Frank Murphy, about an incident between the two students the previous year.  Regarding that prior incident, Murphy told Dean Sharpe that after D.S. came out, the student "expressed that she did not agree with D.S.'s lifestyle due to her religious beliefs." *Id.* ¶ 139.  The student apparently believed that sexual orientation should not have been discussed in school—but she felt inclined to express her beliefs because D.S. "was always talking about it." *Id.*  Dean Sharpe concluded that a comment the student made that God condemned D.S.'s "lifestyle" expressed a difference of opinion rather than constitute harmful speech.  *Id.* ¶ 140.

Regarding the March 12, 2019 incident, Dean Sharpe concluded that the comment that D.S. acted "more like a girl than I do" did not constitute bias-biased harassment, intimidation, or bullying because it did not "constitute a material incident that . . . can be defined as Bullying," and that there was "no reported pattern of bias[-]based speech" or violations of DOE regulations on as much.  *Id.* ¶ 141.  The AC alleges that Principal Angueira reviewed and approved of Dean Sharpe's investigation, as evidenced by his signing a letter to Cianciotto stating that the

allegations of bias-based harassment arising from the March 12, 2019 incident had been deemed unsubstantiated. *Id.* ¶¶ 143–44.

On March 20, 2019, Cianciotto emailed I.S. 126Q's school counselor, Sharon Small, copying Assistant Principal Lalor and Dean Sharpe, regarding another proposed "mediation" with one of D.S.'s bullies. *Id.* ¶ 145.  Cianciotto expressed his lack of faith in the mediation given the last one's failure to result in any meaningful change.  *Id.*  He also explained that D.S.'s hostile school environment was causing D.S. to require up to four counseling sessions every week, causing D.S. to lose sleep and miss school due to anxiety linked to his ongoing bullying. *Id.* ¶ 146.

On April 2, 2019, Dean Sharpe informed Cianciotto that her decision regarding the March 12, 2019 incident reflected her view that the student's comment "did not constitute biased based harassment, intimidation, and or bullying as it is defined under Chancellor's Regulation A-832." *Id.* ¶ 149.  Cianciotto forwarded the email to Jared Fox; in response, Fox told him he would escalate the situation to the Superintendent and Director of Student Services of Queens North.  *Id.* ¶ 150; *see id.* ¶ 113.[7]

On April 10, 2019, Donna Brailsford, Director of Student Services for DOE's Queens North Borough Office, emailed Cianciotto, informing him that she had met with D.S. and I.S. 126Q's Principal, Assistant Principal, and Dean two days earlier.  *Id.* ¶ 151.  D.S.'s parents were not informed of the meeting, but Cianciotto spoke with Brailsford by telephone shortly after receiving her email.  *Id.* ¶¶ 152–53.  Brailsford informed Cianciotto that the March 12, 2019

---

[7] Paragraph 113 of the AC identifies Fox as having the first name, "Jared"; paragraph 150 identifies Fox as having the first name, "Jason."  Context in the AC suggests that the two names refer to the same person.

incident (involving the "acting like a girl" comment) did not constitute bias-based harassment. *Id.* ¶¶ 153–54.

On April 11, 2019, an argument broke out among students, prompting D.S. to leave the classroom to calm down; in response, a student called out, "So long, faggot!" *Id.* ¶¶ 155–56. Cianciotto reported the incident to Dean Sharpe, Brailsford, Small, and Fox, noting that, as a result of the incident, D.S. again "verbally express[ed] that he does not feel safe at school and . . . wants to kill himself," and that Cianciotto needed to consider pulling D.S. from school. *Id.* ¶ 157.  Dean Sharpe investigated the incident and concluded that the incident *did* constitute bias-based harassment—but in response to a prompt in the DOE's online reporting system asking whether "the student(s) engage[d] in the alleged conduct," answered, "No." *Id.* ¶¶ 160–61.  The school notified the offending students' parents but did not take further action. *Id.* ¶¶ 162, 164.

On April 15, 2019, Brailsford responded to Cianciotto's email regarding the April 11 incident, attaching forms regarding requests for home instruction and stating, "I am very sorry your son has to deal with such comments but as you know there are many insensitive people in the world" and "[i]f you decide to remove your son from the school at this time I understand," though "his friends will miss him." *Id.* ¶ 163.

On May 6, 2019, during a class in which D.S. was not present, one student called another "gay," in response to which yet another student interjected, in sum and substance, that "it is OK to be gay" and that "there is nothing wrong with it." *Id.* ¶ 165.  Another student then shouted, "Gays are disgusting, just look at your friend [D.S.]!" *Id.*  As part of Dean Bloch's investigation of the incident, the teacher and paraprofessional supervising the class stated that they had heard nothing. *Id.* ¶ 166.  Dean Bloch concluded that the allegation of bias-based conduct was unsubstantiated, because (1) the student who called another student "gay" was his friend and the

14

latter was unaffected by the comment; and (2) the student who made the "disgusting" comment denied using it to describe gay people, instead claiming that he had been referencing a social media meme. *Id.* ¶ 167. Days later, on May 13, 2019, Dean Bloch updated OORS to reflect that the first student's action—calling another student "gay" as an insult—*did* violate DOE's anti-harassment regulations, and that the incident would now be deemed substantiated. *Id.* ¶ 173.

On May 9, 2019, a student allegedly called D.S. a "fag" in the cafeteria; D.S. reported the incident to a teacher, and Dean Bloch investigated. *Id.* ¶ 168. Because no student corroborated D.S.'s account, Dean Bloch concluded that bias-based harassment had not occurred; the school took no further action. *Id.* ¶ 169.

On May 13, 2019, Dean Bloch met with Principal Angueira to discuss six incidents spanning D.S.'s sixth and seventh grade school years—incidents that, until then, had not been logged in OORS. *Id.* ¶¶ 170–72. In these: (1) teachers failed to address students' rolling their eyes and making "belittling comments" when D.S. gave presentations about LGBT-related issues in Social Studies class; (2) students asked D.S. whether his male friends were gay or his "boyfriends," and spread rumors that D.S. had kissed one of them; (3) a student repeatedly asked D.S. whether he was gay, outed D.S. to others without his consent after D.S. confirmed that he was, asked D.S. who his "crush" was, and called D.S. "gay boy"; (4) a student announced in the auditorium that D.S.'s dads "give blowjobs in the backyard" and, on another occasion, asked D.S. whether a drawing he was working on depicted his dads "after they have sex"; (5) a student called D.S.'s dads "shit" and a "mistake created by Jesus"; and (6) in response to D.S. telling classmates that he had two dads, a student responded, "That's so sad.  You should have a mom." *Id.* ¶ 171.

Dean Bloch investigated the above incidents.  He substantiated the allegation of bias-based harassment regarding students mocking D.S. for presenting on LGBT-related issues in Social Studies class, finding that "teachers Ms. Genao and Kerns" witnessed them.  (The AC alleges that the school did not inquire why the teachers had not previously reported it.)  *Id.* ¶ 175. Dean Bloch also substantiated the allegation that students had asked whether D.S. had "boyfriends" and spread rumors about him kissing a boy at school; multiple students confirmed that there had been such rumor, admitted to questioning D.S. about the issues, and one admitted to calling him a "faggot."  *Id.* ¶ 176.  The AC is silent as to Dean Bloch's specific conclusions— if any—regarding the remaining four incidents.  But it alleges that, on May 23, 2019, Dean Bloch concluded that, overall, D.S. "was subject to harassment and bias[-]based behavior over a period of time from the sixth grade to the seventh grade . . . . This created a hostile school environment for [D.S.].  Furthermore, there were rumors spread about him with regard to his sexual activity (kissing other boys) which constitutes sexual harassment."  *Id.* ¶ 177. Notwithstanding this conclusion, the AC alleges, the school took "no meaningful action to curb the bullying and harassment."  *Id.* ¶ 178.

On May 17, 2019, D.S. asked a student who was taunting him and a friend not to be mean to D.S. because he was having a rough week—he had just learned of his grandfather's terminal cancer diagnosis.  The student replied, in sum and substance, "Let me guess, he's gay too."  *Id.* ¶ 179.  Dean Bloch investigated, but found the allegation unsubstantiated because it lacked "corroboration" and the offending student denied making the comment.  *Id.* ¶ 180.  The school did not take further action.  *Id.*

Also on May 17, 2019, D.S. overhead a student tell another, "That's gay," pejoratively. *Id.* ¶ 181. D.S.'s parents emailed Dean Bloch to inform him what had occurred, but the school did not take action. *Id.* ¶¶ 181–82.

On May 20, 2019, Cianciotto emailed Principal Angueira, Assistant Principal Lalor, and Dean Bloch, requesting an urgent meeting to discuss how to prevent and reduce the bullying D.S. faced. He wrote, *inter alia*, "We [cannot] and will not accept that the status quo is what [D.S.] must experience while attending school," and that "the interventions provided to-date have failed to protect him. He continues to suffer the harmful consequences, including fear, anxiety, depression, self harm," and a stated "desire to die by suicide to make it all go away." *Id.* ¶ 183.

That same day, back in the classroom, a student began passing notes to D.S. One called him a "gay bitch" and another read, "because you don't love Jesus your [sic] an asshole . . . you [sic] going to hell you white idiot." *Id.* ¶ 186. D.S. wrote back, "I love Jesus." *Id.* ¶ 187. In response to an email from Dean Bloch to Cianciotto that morning to notify him about the notes incident, Cianciotto wrote, "I am coming to the school to take [D.S.] home. . . . I [cannot] allow [D.S.] to remain in a school where these incidents continue to occur." *Id.* ¶¶ 188–89. Dean Bloch logged the incident in OORS and deemed it a substantiated instance of discrimination and bias-based harassment; however, other than sending letters to the involved students' parents, the school did not take remedial action. *Id.* ¶ 190.

On the evening of May 20, 2019, Assistant Principal Lalor responded to Cianciotto's email request for a meeting, proposing to meet three days later, on a Thursday. *Id.* ¶ 191. Cianciotto confirmed the meeting, adding that D.S. could not "attend school in his current class until either a change is made that is amenable to all or we find another option for him outside of [I.S.] 126Q. What do you propose we can do since you are not able to meet with us until

Thursday morning?" *Id.* ¶ 192. Cianciotto also asked if further absences could be excused so as not to affect D.S.'s chances of high school admission. *Id.* Nobody responded to the inquiry. *Id.* ¶ 193.

D.S.'s parents also reached out to Fox, who responded by writing, in part, "I am heartbroken after all your son has endured that this furthered his trauma." *Id.* ¶¶ 194–95. Fox connected D.S.'s parents with Amanda Lurie, Senior Executive Director at DOE's Office of Student Enrollment, writing that he would work with Lurie to find a "great, affirming school for [D.S.] to finish out the year and hopefully hit the reset button on the experiences he has had so far. This does not excuse the things your son has endured, and we will continue to work with [I.S. 126Q] on supports so that no student endures" what D.S. had. *Id.* ¶ 195. Lurie wrote back, in relevant part, "I am so sorry that your son is living with this. As the parent of a LGBT child myself, there is no greater sadness than to watch your child experience this. I promise that we will work to find a better environment for your son." *Id.* ¶ 196.

On May 22, 2019, Cianciotto met with Principal Angueira, Assistant Principal Lalor, and Dean Bloch. In response to Cianciotto's inquiry whether the school would be able to protect D.S. from further bullying, Angueira stated that other parents had alleged that D.S. was receiving "unfair attention" at school, and that he did not know how to explain why D.S. was receiving "special treatment." *Id.* ¶ 199. He further stated that there were no classes at I.S. 126Q that would reasonably assure that the bullying would stop, and that D.S.'s absences since the May 20 notes-passing incident could not be excused. *Id.* ¶¶ 200–01.

After the meeting, D.S.'s parents worked with Lurie and her colleague to "effect an emergency transfer out of I.S. 126Q to protect D.S.'s safety." *Id.* ¶ 202. Under DOE regulations, Cianciotto alleges, such safety transfers can occur only where "it is determined that

the student's continued presence in the school is unsafe for the student." *Id.* ¶ 203. By the end

of the week, D.S. was attending a different school. *Id.* ¶ 204.

D.S. never again attended class at I.S. 126Q. *Id.* ¶ 205.

### 4.    The Administrative Hearing

In light of his PTSD and learning disabilities, D.S. is entitled to special education and

other services under the Individuals with Disabilities Education Act ("IDEA"), including an IEP.

*Id.* ¶¶ 206–207. At an unspecified time during D.S.'s sixth grade year at I.S. 126Q, his parents

participated in an IEP meeting with Kerns (D.S.'s special education teacher) and other

representatives of the school and DOE to discuss "the establishment of goals, services, and

supports for D.S." *Id.* ¶ 208. During the meeting, D.S.'s parents raised concerns about how the

bullying he faced impacted his education, but Kerns and others "refused to discuss the bullying

and stated that it was not an appropriate topic to be included or addressed in an IEP." *Id.* ¶ 209.

The IEP that DOE adopted for D.S. on or about March 27, 2018 did not include any services or

supports to mitigate the effects of the bullying on D.S. *Id.* ¶ 210.

On January 9, 2019 (during D.S.'s seventh grade year), D.S.'s parents asked that his IEP

be reopened and a new IEP meeting take place. *Id.* ¶ 211. On January 29, 2019, that meeting

occurred. *Id.* ¶ 212. At it, Kerns and other IEP team members again "refused to meaningfully

discuss the bullying that D.S. was enduring at school and again stated that it was not an

appropriate topic to be included or addressed in an IEP." *Id.* The resulting IEP again did not

include services or support to mitigate the effects of the bullying on D.S. *Id.* ¶ 213. The "Social

Development" section of D.S.'s IEP stated that D.S. "is easily frustrated with his classmates, which can lead to conflicts with his peers."[8]  *Id.* ¶ 214.

On or about March 25, 2019, D.S.'s parents sent the school a list of their concerns regarding D.S.'s IEP.  *Id.* ¶ 220.  Among other issues, they stated that D.S.'s PTSD

> deeply impacts him, as he is unable to negotiate environments when they become too loud, too fast, and/or too hectic.  In combination with his disability, this makes it even harder for him to cope with the bullying and teasing he has experienced at school based on his sexual orientation and perceived gender expression . . . . [S]ometimes he must leave the classroom to meet with school counselors to cope with his distress and misses instructional time.  We are very concerned about the continued incidents of bias-related offenses and related teasing and social isolation that [D.S.] experiences at school.  [Furthermore, D.S. has been] a victim of bias-related bullying based on his sexual orientation and/or perceived gender expression. As a result, he has suffered tremendously.  And, it directly impacts his access to the curriculum because the stress is overwhelming and exacerbates his disability and diagnosed Post Traumatic Stress Disorder.

*Id.* ¶¶ 220–21.  Further, they noted that D.S. had a history of "self-harm while at school when his emotional stress is not addressed, including hitting his head, biting himself, and suicidal ideation. It is critical to point out that these behaviors rarely happen at home.  And [D.S.] frequently states that his suicidal ideation is because he is 'picked on' and 'does not feel safe'" at school.  *Id.* ¶ 222.  The parents also explained that "[p]reventing classroom conflict and addressing instance of teasing, conflict, and bullying immediately will keep [D.S.] from missing instructional time." *Id.* ¶ 223.  They sought an amended IEP that would put in place a "supportive and culturally competent environment," including "training and support for [D.S.]'s teachers and school, such as training in trauma informed care, crisis de-escalation, and cultural competency on issues affecting LGBTQ youth."  *Id.* ¶ 224.  In response, on an unspecified date, the school and DOE

---

[8] Cianciotto states that this characterization "typified" the school's "frequent practice of blaming D.S. for perceived disruptions caused by his disability-related behaviors," AC ¶ 215, as also evidenced by a meeting between Kerns, Cianciotto, and D.S., in which Kerns admonished D.S. for failing to "focus" and "concentrate" in class, *id.* ¶¶ 216–17.

reopened D.S.'s IEP, but did not add any plans or proposals for addressing D.S.'s ongoing bullying. *Id.* ¶ 225.

On or about June 25, 2019, Cianciotto filed with DOE's Impartial Hearing Office a due process complaint requesting an impartial hearing under the IDEA, stating that DOE had failed to provide D.S. with a free and appropriate public education ("FAPE") during the 2017–2018 and 2018–2019 school years. *Id.* ¶ 226; *see* Dkt. 35, Ex. B.  It alleged, *inter alia*, that DOE had failed in D.S.'s IEPs to (1) provide appropriate behavior supports, (2) recommend an appropriate behavior assessment or behavior intervention plan, (3) establish appropriate annual goals regarding D.S.'s academic deficits, (4) recommend appropriate remedial services to improve D.S.'s academic performance, (5) provide appropriate assessments of D.S.'s need for occupational or speech therapy, (6) evaluate D.S.'s need for assistive technology, and—critical for this case—(7) address the bullying D.S. faced at I.S. 126Q and its effects on his ability to learn.  AC ¶¶ 227–28.  The complaint explained that D.S. regularly experienced bullying on a near-weekly basis from other students, that D.S.'s parents had unsuccessfully raised concerns about the bullying during IEP meetings, and that the emotional impact of the bullying had often led D.S. to leave class to contain his distress. *Id.* ¶ 228.  The complaint alleged that DOE failed to take affirmative steps to curb the harassment and bullying, and that no efforts had been made to support D.S. or evaluate how the bullying affected his academic performance. *Id.* ¶ 229.

"[B]etween 2019 and 2020," Impartial Hearing Officer ("IHO") Mindy G. Wolman held an impartial hearing on the complaint. *Id.* ¶ 230.  During that administrative proceeding, DOE conceded that it had violated the IDEA and failed to provide D.S. a FAPE. *Id.* ¶ 231.  In her Findings of Fact and Decision, dated July 31, 2020, IHO Wolman ruled in favor of D.S. and his parents and directed DOE to provide D.S. with an occupational therapy evaluation, a functional

behavioral assessment, a trauma informed psychological assessment, 700 hours of compensatory tutoring, and 400 hours of trauma informed therapy.[9] *Id.* ¶ 232; *see* IHO Decision.  IHO Wolman concluded that "two years of bullying that [D.S.] was subjected to at I.S. 126, and the apparently callous disregard of school staff," contributed to D.S.'s deprivation of a FAPE.  AC ¶ 233.  She explained:

> The impact of the Student's prior trauma was greatly exacerbated by the prolonged and intense bullying.  Not only did the school fail to address the bullying, but the Sixth Grade Dean of the school went so far as to blame the Student for making himself a target of the bullying . . . . I am at a loss to understand how an educational professional could possibly blame a child for being the victim of a prolonged and severe pattern of emotional and physical bullying. . . . The failure to address the bullying situation that the Student experienced constituted a deprivation of FAPE. In addition to not making academic progress, the Student actually experienced substantial emotional, behavioral and social regression during his two years at I.S. 126.  Per the testimony at the hearing, the bullying constituted an additional and continuing trauma throughout the time of the Student's attendance at the school.

*Id.* ¶¶ 233–34.

DOE did not contest or appeal the IHO's decision.  *Id.* ¶ 235.

**B.  Procedural Background**

On June 28, 2021, Cianciotto filed the initial complaint.  Dkt. 1.  On September 2, 2021, defendants filed the instant motion to dismiss and a memorandum of law in support.  Dkt. 32 ("Mot.").  On September 23, 2021, Cianciotto filed an opposition.  Dkt. 34 ("Opp'n").  On October 7, 2021, defendants filed a reply.  Dkt. 38 ("Reply").

On November 2, 2021, the Court held an initial pretrial conference and, among other things, authorized limited discovery to commence pending resolution of the motion to dismiss, and set deadlines regarding an anticipated amended complaint.  *See* Dkt. 41.  On November 8, 2021, Cianciotto filed the amended complaint.  Dkt. 42.  On November 16, 2021, defendants

---

[9] IHO Wolman awarded D.S. compensatory services but not compensatory damages.  AC ¶ 234.

filed a letter supplementing their previously filed motion to dismiss.  Dkt. 43.  On November 23, 2021, Cianciotto filed a letter supplementing his opposition.  Dkt. 44.  On December 1, 2021, defendants filed a reply letter.  Dkt. 45.

## II.     Legal Standard Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.    Discussion[10]

Cianciotto brings federal claims—under Title IX and Section 504 of the Rehabilitation Act—against DOE and BOE only.

---

[10] Because defendants have abandoned the argument that some of Cianciotto's claims are untimely, *see* Reply at 1 ("Defendants agree that Plaintiffs' claims are not time-barred."), the Court will not address it.

**A.      Title IX in the Sexuality and Gender-Based Bullying Context**

**1.      Legal Standard**

Cianciotto's Title IX claim is principally based on a theory that D.S. was subjected to a hostile educational environment vis-à-vis sexuality and gender-based bullying from his peers. Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.  "[T]o state a claim under Title IX, a plaintiff must allege that she has been 'excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination under' any educational program receiving federal funding on the basis of gender." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 314 (S.D.N.Y. 2000) (quoting 20 U.S.C. § 1681a).

"[S]tudent-on-student sexual harassment, if sufficiently severe, can . . . rise to the level of discrimination actionable under the statute." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  In the specific context of "student-on-student harassment, damages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies the victim equal access to education." *Id.*  Although whether gender-based harassment is actionable depends on a "constellation of surrounding circumstances, expectations and relationships," *id.* at 651, courts in this Circuit have found harassment like that D.S. claims to have faced sufficient to support liability. *See, e.g.*, *J.R. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 0392 (ILG), 2015 WL 5007918, at *6 (E.D.N.Y. Aug. 20, 2015) ("Although Title IX does not protect against bullying based solely on homosexuality, the Supreme Court has held that harassment based on aversion to given gender preferences can support a Title VII claim, and district courts in this Circuit have

24

extended this holding to Title IX claims."); *Pratt v. Indian River Sch. Dist.*, 803 F. Supp. 2d 135,

150–52 (N.D.N.Y. 2011); *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 226 (D. Conn.

2006); *see also* Adele P. Kimmel, *Title IX: An Imperfect but Vital Tool to Stop Bullying of LGBT*

*Students*, 125 YALE L.J. 2006, 2015 nn.44–45 (2016) (citing cases).  Related, a school district

can be liable for a third party's conduct only if it "exercises substantial control over the

circumstances of the harassment when it occurs 'during school hours and on school grounds.'"

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) (quoting *Davis*, 526 U.S.

at 646).  The parties do not dispute that that requirement is met here.

  For purposes of the motion to dismiss Cianciotto's Title IX claim, the sole issue in

dispute is whether another requirement—deliberate indifference—has adequately been pled.  For

"an educational institution to be liable for sexual harassment under Title IX, a plaintiff must

demonstrate that 'a school official with authority to address the alleged discrimination and to

institute corrective measures' had 'actual knowledge' of the sexual harassment and responded

with 'deliberate indifference.'"  *Campisi v. City Univ. of N.Y.*, No. 15 Civ. 4859 (KPF), 2016

WL 4203549, at *5 (S.D.N.Y. Aug. 9, 2016) (quoting *Papelino v. Albany Coll. of Pharm. of*

*Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011)).  The Second Circuit has articulated the standard

for deliberate indifference:

> The school's action—or inaction—must, at a minimum, cause students to undergo
> harassment or make them liable to or vulnerable to it.  A finding of deliberate
> indifference depends on the adequacy of a school district's response to the
> harassment.  A failure to respond, a response that only follows after a lengthy and
> unjustified delay, and a response that amounts to deliberate indifference to
> discrimination, have all been found inadequate.  Nevertheless, a school district's
> actions are only deliberately indifferent if they were clearly unreasonable in light
> of the known circumstances.  Thus, when weighing the adequacy of a response, a
> court must accord sufficient deference to the decisions of school disciplinarians.

*Zeno*, 702 F.3d at 666 (cleaned up); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.

274, 290 (1998).  Because "[d]eliberate indifference will often be a fact-laden question," it is ill-

suited for disposition on a motion to dismiss. *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp.

2d 387, 398–99 (E.D.N.Y. 2005) (quotation omitted).

### 2.      Deliberate Indifference: Collateral Estoppel

At the threshold, the Court addresses an issue the parties sharply debate: whether

defendants are collaterally estopped from contesting that the school acted with deliberate

indifference.  In her Findings of Fact and Decision—from which DOE did not appeal—IHO

Wolman stated that "DOE . . . turned a blind eye to the severe bullying that [D.S.] was

experiencing at I.S. 176 [sic]," noted "the apparently callous disregard of school staff," and

criticized the school for "fail[ing] to address the bullying, . . . [going] so far as to blame [D.S.]

for making himself a target of the bullying."  IHO Decision at 7–8.  Cianciotto casts such

statements—particularly the "callous disregard" statement—as "specific and necessary" findings

that preclude defendants from now disputing that they acted with deliberate indifference.

#### a.      *Legal standards*

"The doctrine of collateral estoppel prevents a plaintiff from relitigating in a subsequent

proceeding an issue of fact or law that was fully and fairly litigated in a prior proceeding."

*Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (citing *Marvel Characters, Inc. v. Simon*, 310

F.3d 280, 288 (2d Cir. 2002)).  The prior proceeding need not necessarily be judicial in nature; in

some contexts, where an administrative agency "employ[s] procedures similar to those used in a

court of law," *Payton v. Metro-N. Commuter R. Co.*, No. 93 Civ. 4840 (SAS), 1995 WL 640591,

at *2 (S.D.N.Y. Oct. 31, 1995), "a quasi-judicial administrative action" may result in "findings . .

. entitled to preclusive effect," *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free

Sch. Dist.*, 411 F.3d 306, 308 (2d Cir. 2005); *see Bonheur v. Dresdner Bank, A.G.*, No. 85 Civ.

4925 (GLG), 1986 WL 4702, at *4 (S.D.N.Y. Apr. 14, 1986) ("It is well settled that the doctrines

of *res judicata* and collateral estoppel, if applicable, give conclusive effect to the quasi-judicial

determinations of administrative agencies."); *see also Krasner v. City of New York*, No. 11 Civ.

2048 (PGG), 2013 WL 5338558, at *11 (S.D.N.Y. Sept. 23, 2013) ("[W]hen a state agency

acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the

parties have had an adequate opportunity to litigate, federal courts must give the agency's

factfinding the same preclusive effect to which it would be entitled in the State's courts.")

(internal quotation marks omitted); *James v. N.Y.C. Health & Hosp. Corp.*, No. 15 Civ. 6015

(PAE), 2017 WL 3923675, at *7 (S.D.N.Y. Sept. 6, 2017).

　　　　Collateral estoppel, however, is permitted only if "(1) the identical issue was raised in a

previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding;

(3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue

was necessary to support a valid and final judgment on the merits." *Interoceanica Corp. v.*

*Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (internal quotation marks omitted).  These four

facts are necessary but not sufficient.  *See Bear, Stearns & Co. Inc. v. 1109580 Ontario, Inc.*,

409 F.3d 87, 91 (2d Cir. 2005).  More broadly, the Court must also "satisfy itself that application

of the doctrine is fair." *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

　　　　The Court must exercise caution in determining whether collateral estoppel applies

following a quasi-judicial proceeding.  "[S]ince administrative agencies are normally charged

with making determinations based on unique, and often times complex, statutes and regulations

which apply specifically to them, care must be taken in identifying the precise issue necessarily

decided in the first proceeding and comparing it to the issue involved in the second proceeding."

*Pelzer v. Transel Elevator & Elec. Inc.*, 839 N.Y.S.2d 84 (App. Div. 2007) (internal quotation

marks omitted).  Moreover, as to whether a party has had a full and fair litigation opportunity at a

quasi-judicial proceeding, the court must conduct "a practical inquiry into the realities of litigation," examining factors including, among others, "the extent of the litigation." *Bd. of Educ. of Manhasset Union Free Sch. Dist. v. N.Y. State Hum. Rts. Appeal Bd.*, 106 A.D.2d 364, 365–66 (N.Y. App. Div. 1984) (internal quotation marks omitted)

"Issue preclusion will apply only if it is quite clear that the elements have been met so that a party is not precluded from obtaining at least one full hearing on his or her claim." *Latino Officers Ass'n v. City of New York*, 253 F. Supp. 2d 771, 783 (S.D.N.Y. 2003) (internal quotation marks omitted). "The burden of showing that the issues are identical and necessarily were decided in the prior action rests with the party seeking to apply issue preclusion." *Id.* Conversely, "the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with the party opposing its application." *Id.*

        *b.*    *Application*

In support of his argument that defendants are precluded from contesting the finding of deliberate indifference, Cianciotto relies primarily on *F.M. ex rel. Ms. M. v. Anderson Ctr. for Autism*, No. 13 Civ. 0041, 2014 WL 4457256 (N.D.N.Y. Sept. 10, 2014). There, a student's mother alleged that educational institutions failed to properly accommodate the student's autism spectrum disorder and engaged in abusive physical interventions against him. *Id.* at *1. At an administrative hearing, an impartial hearing officer disagreed, finding that the school district: (1) promptly and professionally responded to an incident regarding the student, (2) consistently offered therapy services to the student, and (3) took earnest efforts to provide special education services to the student. *Id.* at *17. Those facts, along with the parents' unreasonable conduct and demands, estopped the mother from establishing, in the federal-court case she brought, a

denial of a FAPE, discriminatory intent, or retaliatory intent by the school district. *Id.* The "particular circumstances of th[at] case" compelled the outcome. *Id.*

The particular circumstances of *this* case compel a different outcome. Before the agency, DOE acknowledged that it did not provide D.S. with a FAPE, *see* IHO Decision at 3, and it opted not to appeal from IHO Wolman's decision to that effect. To be sure, DOE's acceptance of fault binds it to the IHO's bottom-line decision that the school deprived D.S. of a FAPE. *See* 8 N.Y.C.R.R. § 200.5(j)(5)(v) ("The decision of the impartial hearing officer shall be binding upon both parties unless appealed to the State review officer."); 20 U.S.C. § 1415(i)(1)(A) (providing that the decision in an IDEA due process hearing "shall be final" absent appeal).

But, critically, the IDEA—the statute that entitles students to a FAPE—does not require a finding of deliberate indifference to establish such a violation. Instead, a "parent can prove a FAPE deprivation by establishing either that (1) the state did not comply with the procedural requirements of the IDEA; or (2) an IEP was not 'reasonably calculated to enable the child to receive educational benefits.'" *Carrillo v. Carranza*, No. 20 Civ. 4639 (CM), 2021 WL 4137663, at *10 (S.D.N.Y. Sept. 10, 2021) (quoting *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982)). By contrast, Title IX requires a showing of deliberate indifference to support a damages award against a violating institution. *See Papelino*, 633 F.3d at 89; *cf. infra* Section III.B.1 (caselaw holding that liability under Section 504 of the Rehabilitation Act may be established by proving deliberate indifference *in addition to* a FAPE denial). To prevail before the IHO on his IDEA claim, Cianciotto was thus not required to prove deliberate indifference, whereas his damages claim under Title IX requires that. DOE thus did not have the same incentive to litigate that issue, or, having conceded denial of a FAPE, to appeal the IHO's finding to that effect.

Indeed, even if the required elements of the IDEA and Title IX were identical, that would still not be enough to sustain Cianciotto's claim of estoppel. Far from fully and fairly litigating the question of whether the school acted with deliberate indifference to D.S.'s reports of bullying, DOE "did not present any testimony or documentary evidence" as to the bullying or the school's response. IHO Decision at 9.

On these facts, Cianciotto has not met his burden of showing that the issue of deliberate indifference was "identical and necessarily" decided by the IHO. *Latino Officers Ass'n*, 253 F. Supp. 2d at 783; *see James*, 2017 WL 3923675, at *8 (denying summary judgment to defense on theory of collateral estoppel where, before agency, plaintiff waived right to opening statement and did not fully and fairly litigate before agency the central issue before the federal court).

The Court finds defendants not collaterally estopped from contesting deliberate indifference.

### 3.   Deliberate Indifference: Application to This Case

Although defendants are at liberty to contest deliberate indifference, their argument that the AC does not adequately plead it falls well short.

As to the harassment, as pled, for years, D.S. faced a steady stream of bullying and harassment from his peers. Almost immediately after coming out as gay and revealing the fact that his fathers are gay, the AC alleges, D.S. was ruthlessly bullied within I.S. 126Q for his sexuality and gender expression. He was regularly called derogatory names—including "fag," "faggot," "faggot ass," "homo," "gay kid," "gay boy," "bitch," "gay bitch," and "pussy dick sucking face." AC ¶¶ 82, 84, 86, 88, 90, 96–97, 155–56, 186. He was told that it was "so sad" that he had two dads—who were "shit" and a "mistake created by Jesus"—and that he "should have a mom." *Id.* ¶¶ 66–67, 171. Rumors spread that D.S. had kissed his male friends and had

30

boyfriends, and that his dads gave "blowjobs in the backyard." *Id.* ¶¶ 68, 171, 177. Students made crude sexual jokes about D.S.'s means of dealing with the stress, *see, e.g., id.* ¶ 78 (student taunting D.S. by telling him to "squish those balls" when D.S. used stress balls to calm down), and asked whether his drawings depicted his dads having sex, *id.* ¶ 171. They told him not to act "like a girl." *Id.* ¶¶ 63, 137. They outed him without his consent. *Id.* ¶ 171. They teased that D.S.'s dying grandfather was likely gay, just like D.S. *Id.* ¶ 179. Even D.S.'s friends became subject to harassment due to their association with D.S. *See, e.g., id.* ¶¶ 68 (rumors spread that D.S.'s male friends were his boyfriends or had kissed D.S.), 86, 165 (student shouting, "Gays are disgusting, just look at your friend [D.S.]"), 171. D.S.'s and his fathers' efforts to create a safe space for D.S. at school—a GSA club—were rejected in deference to other students' potential offense at the club. *Id.* ¶¶ 103–09.

In response, the AC alleges, D.S. largely kept to himself. *Id.* ¶ 71. He began to lose sleep and miss school due to anxiety about the bullying, which in turn required multiple counseling sessions every week to deal with it all. *Id.* ¶ 146. And he developed suicidal ideations—making comments to that effect before both teachers and his parents. *Id.* ¶¶ 80, 183, 222; *cf. T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 358 (S.D.N.Y. 2014) (student facing anti-Semitic harassment driven to suicidal ideations and eventually withdrawing from school); *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1112–13 (E.D. Cal. 2011) (detailing sexuality based bullying that drove middle schooler to commit suicide).

As pled, defendants were on ample—indeed, detailed—notice of D.S.'s claims of bullying and of its dire consequences for him. Many of the bullying comments occurred in class, in the presence of his teachers. *See* AC ¶¶ 67, 69. D.S. also—bravely—reported many incidents of bullying to his teachers and school administrators. *See id.* ¶¶ 65, 86, 97, 127–29, 157, 168.

His parents repeatedly confronted the school about the bullying and need for effective intervention. *See id.* ¶¶ 73, 130–31, 133, 138, 181–82. They demanded meetings with school officials to discuss their son's harassment and find solutions. *Id.* ¶¶ 130–31, 183. On occasion, D.S.'s teachers and guidance counselors logged incidents of the bullying in DOE's system to alert others to the problem. *Id.* ¶¶ 79, 87 (note from teacher regarding student who called D.S. a "faggot" stating, *inter alia*, "PLEASE HELP!!!"), 143–44, 160–61, 175. DOE officials outside of I.S. 126Q met with D.S. and school officials to discuss his bullying, and escalated the issue within DOE. *See, e.g., id.* ¶¶ 115, 120, 151, 194. On these facts, the AC overwhelmingly pleads that the defendants were on notice of the problem. *See Zeno*, 702 F.3d at 668 (reporting of harassment to school principal and administrators put school district on notice of plaintiff's harassment); *DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 495 (S.D.N.Y. 2008) (plaintiff's conversation with principal and three letters sent to school officials about harassment plaintiff suffered placed defendants on notice of racial hostility), *aff'd*, 348 F. App'x 697 (2d Cir. 2009) (summary order).

As alleged, however, the school failed to meaningfully respond to those pleas. The AC recounts only sporadic responses by limited officials at I.S. 126Q. Dean Edwards suggested sequestering D.S. from his peers at lunch. AC ¶ 71. The school hosted a handful of "mediations" between D.S. and his student tormentors (despite Cianciotto flagging that previous mediations had failed to result in any meaningful change). *Id.* ¶¶ 77, 145. School administrators conducted various "investigations," but these generally concluded—blatantly wrongly according to the AC—that bias-based harassment had not occurred. *See, e.g., id.* ¶¶ 89 (so concluding where student called D.S. "pussy dick sucking face"), 91 (same on ground that student who called D.S. a "faggot" lacked "any contextual relationship to the term"), 100 (same on ground

that being called a "faggot" did "not constitute a material incident that creates a severe and hostile environment for D.S."), 169 (same where student called D.S. a "fag"); *see also id.* ¶¶ 140–44, 149, 153–54, 179–80. Where it so found, the school did not take further action to protect D.S.

Even when the school found instances of bias-based harassment, the AC alleges, school officials often did nothing or next to nothing in response. *See id.* ¶¶ 74, 83, 136, 178. Teachers occasionally contacted Cianciotto to report incidents, *see, e.g., id.* ¶ 95, and on two occasions the school notified the offending students' parents, too, *see id.* ¶¶ 162, 190. But sometimes the school did not act in response. *See id.* ¶¶ 162, 190. The school even suggested—or demanded—that D.S. stop speaking openly about his sexual orientation, including to stop the bullying. *Id.* ¶¶ 73 (Dean Edwards telling D.S. that speaking out was "inappropriate" and that he would not face such constant bullying if he stopped), 110 (teacher cutting off D.S.'s in-class presentation on LGBTQ-related issues because it was "too personal").

As pled, D.S.'s parents put a broad array of DOE administrators on notice of the severe bullying that D.S. was experiencing. These included (1) Fox, a DOE LGBT Community Liaison, *see id.* ¶¶ 113 (emailing Fox regarding D.S.'s teacher interrupting his presentation on LGBTQ-related issues), 150 (forwarding to Fox email from Dean Sharpe concluding that incident of alleged bullying did not constitute biased-based harassment), 194 (reaching out to Fox for assistance in ensuring a safe environment for D.S.); (2) Riordan, Deputy Executive Director for DOE's Office of Equal Opportunity, *see id.* ¶¶ 117–18 (arranging interview with Riordan and DOE investigator Susan Lee); (3) Brailsford, the Director of Student Services for DOE's Queens North Borough Office, *see id.* ¶¶ 152–53 (discussing incident of alleged bullying with Brailsford over the phone); and (4) Lurie, a Senior Executive Director of DOE's Office of

Student Enrollment, *see id.* ¶ 202 (working with Lurie to effect D.S.'s emergency transfer out of the school). Yet eventually, the AC pleads, the school and DOE threw in the towel—conceding that they were unable to protect D.S. within the school environment. *See, e.g., id.* ¶¶ 163 (DOE official apologizing to Cianciotto that D.S. had to "deal with such comments" while noting that "there are many insensitive people in the world" and "[i]f you decide to remove your son from the school at this time I understand"), 199 (Principal Angueira referring to "special attention" D.S. was receiving and stating that there were no classes at I.S. 126Q that would reasonably assure that the bullying would stop).

Defendants defend their actions as reasonably calculated to end the harassment. They are at liberty to pursue such an argument during this litigation. And perhaps discovery will reveal that defendants did more to meaningfully address the bullying D.S. experienced than is revealed by the AC and the administrative materials it attaches. On the pleadings, however, which, on a motion to dismiss, must be read in the light most favorable to the plaintiff, such a defense is unsustainable. The AC plausibly pleads long-running inattention, inaction, and deflection by the defendants, which was not close to offset by the school's occasional logging of incidents, hosting of toothless "mediations," and the like. Far from pleading facts short of deliberate indifference, the AC pleads that school officials turned a blind eye to the harassment D.S. was experiencing, doing little, if anything, to protect him while rarely informing his and his aggressors' parents of disturbing incidents of abuse, often blaming him for instigating his own harassment, and "investigating" incidents without meaningful follow-up. The pleadings are devoid of evidence, too, that as the bullying persisted and intensifying, officials reassessed or adjusted their approach, or stepped up their attempts to curb the bullying. On the facts pled, the school's efforts were not "reasonably calculated to end [the] harassment." *Zeno*, 702 F.3d at 669. Indeed,

the facts alleged make out a textbook case of deliberate indifference. *See Campisi*, 2016 WL 4203549, at *7 (denying motion to dismiss Title IX claim where school's response to plaintiff's report of harassment offered "insufficient solutions that left her vulnerable to future harassment"); *J.R.*, 2015 WL 5007918, at *6 (same where male student was severely bullied for effeminate mannerisms and way of speaking and school failed to adequately discourage harassment); *Pratt*, 803 F. Supp. 3d at 152 (same).[11]

To be sure, as defendants rightly note, courts as a general matter should refrain from second guessing the day-to-day disciplinary decisions they are charged with making. *See Davis*, 526 U.S. at 648. But that does not categorically insulate school officials from liability in well-pled cases of unreasonable official responses to a student's harassment. And, on the pleadings here, the school's failure to act to protect a known vulnerable student in the face of known severe bullying cannot be found reasonable so as to entitle it and its officials to any such solicitude. *See T.C. v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 596 (S.D.N.Y. 2011) (court may find deliberate indifference when the "defendant's response to known discrimination is clearly unreasonable in light of the known circumstances or when remedial action only follows after a lengthy and unjustified delay") (internal quotation marks omitted). As pled, the school here, at every turn, either did nothing or resorted to the same ineffectual responses that had proven incapable of stopping D.S.'s harassment. As such, the school ignored "signals that greater, more directed action was needed." *Zeno*, 702 F.3d at 671.

---

[11] Having found that the allegations regarding defendants' response to the peer-to-peer harassment adequately describe deliberate indifference, and in deference to the discretion schools have in managing their student bodies, *see Davis*, 526 U.S. at 648, the Court has no occasion to address the argument that D.S. was directly harassed by his teachers, *see* Opp'n at 18–19 (arguing that defendants "actively participated" in D.S.'s harassment, as evidenced by Principal Angueira's declination to create a GSA and teacher Kerns's decision to prevent D.S. from completing an in-class presentation on LGBTQ-related issues).

The Court accordingly denies defendants' motion to dismiss the AC's Title IX claim.

**B.      Rehabilitation Act**

**1.      Legal Standard**

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).  To

state a *prima facie* violation of Section 504, a plaintiff must show that "(1) he is a '[disabled]

person' under the Rehabilitation Act; (2) he is 'otherwise qualified' for the program; (3) he is

excluded from benefits solely because of his [disability]; and (4) the program or special service

receives federal funding." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840–41 (2d

Cir. 2014) (alterations in original) (quoting *Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir. 1990)).

Importantly, in the school bullying context, the bullying itself need not be based on a

disability—*i.e.*, the object of the bullying need not be the victim's disability.  That is because, in

such cases, the claim "focuses on a different harm":  The denial of the student's right, under the

IDEA, to an appropriate education.  *T.J. ex rel. B.W. v. Bd. of Educ.*, No. 17 Civ. 9592 (JCH),

2019 U.S. Dist. LEXIS 171583, at *45 (S.D.N.Y. Sep. 30, 2019).  The Second Circuit has thus

recognized that a Section 504 violation "may be predicated on the claim that a disabled student

was denied access to a free appropriate education, as compared to the free appropriate education

non-disabled students receive." *C.L.*, 744 F.3d at 841 (cleaned up).

Nonetheless, because the Rehabilitation Act addresses "discrimination against disabled

students, rather than failures to provide special education services, a claim [based on] a denial of

a FAPE brought under [Section 504] requires 'something more than a mere violation of the

36

IDEA.'" *T.J.*, 2019 U.S. Dist. LEXIS 171583, at *45 (quoting *C.L.*, 744 F.3d at 841); *see also Rutherford v. Fla. Union Free Sch. Dist.*, No. 16 Civ. 9778 (KMK), 2019 WL 1437823, at *34 (S.D.N.Y. Mar. 29, 2019). "That 'something more' is evidence that the defendant acted with 'bad faith or gross misjudgment.'" *T.J.*, 2019 U.S. Dist. LEXIS 171583, at *45 (quoting *C.L.*, 744 F.3d at 841). Put otherwise, discrimination sufficient to support a Section 504 claim "may be inferred when there is 'evidence that a school district acted with deliberate or reckless indifference to the student's federally protected rights or with bad faith or gross misjudgment.'" *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 518 (S.D.N.Y. 2013) (quoting *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010)); *see also Rutherford*, 2019 WL 1437823, at *34 ("[I]ntentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE.").

### 2.    Application

Defendants' first argument is that the AC does not allege that D.S. was bullied *because of* his disabilities. Even if true, that is not of any moment, as Section 504 claims do not require such a factual basis. *See T.J.*, 2019 U.S. Dist. LEXIS 171583, at *45; *Rutherford*, 2019 WL 1437823, at *34. Indeed, defendants acknowledge that, "[i]n the alternative," a Section 504 claim may be based on the denial of a FAPE, so long as a school acted with gross negligence or reckless indifference in so denying. Mot. at 32 (citing *T.J.*, 2019 U.S. Dist. LEXIS 171583, at *45–47).

Defendants next argue that they "went to great lengths in their attempts to mitigate the alleged bullying." *Id.* at 11. But that spin on the facts is forcefully contradicted by the pleadings, which on a motion to dismiss must be taken as true. It is well pled—indeed, it

appears largely undisputed at this stage—that: (1) the school deprived D.S. of a FAPE, as IHO Wolman found in a decision that defendants did not challenge; (2) the deprivation was based on the bullying D.S. experienced at the school; (3) the bullying substantially interfered with D.S.'s educational opportunities; and (4) the school did not account for the bullying in D.S.'s IEP, which lacked an anti-bullying plan or the provision of reasonable services to stop (or mitigate) the bullying. *See* AC ¶¶ 209–10 (alleging that in D.S.'s sixth grade year Kerns and others "refused to discuss the bullying and stated that it was not an appropriate topic to be included or addressed in an IEP," and refused to include in the IEP any services or supports to mitigate the effects bullying had on him), 211–13 (same during D.S.'s seventh grade year); 219–25 (school refusing to amend IEP despite list of concerns Cianciotto sent regarding the IEP's failure to account for D.S.'s bullying).[12]

And the AC adequately alleges that defendants were deliberately indifferent in their response to D.S.'s bullying. *See supra* Section III.A.2.b. That in turn meets the pleading requirement for a Section 504 claim in cases involving denial of a FAPE that the school district have acted with "deliberate or reckless indifference." *D.C.*, 950 F. Supp. 2d at 518.

The Court accordingly denies defendants' motion to dismiss the Section 504 claim. *See Scaggs v. N.Y.C. Dep't of Educ.*, No. 06 Civ. 799 (JFB), 2007 WL 1456221, at *16 (S.D.N.Y. May 16, 2007) (denying motion to dismiss Section 504 claim where complaint alleged extensive failures and omissions with regard to disabled students, defendants' awareness of plaintiffs' disabilities, plaintiffs' requests to accommodate to them, and school's intentional refusal to take

---

[12] *Cf. T.K. v. N.Y.C. Dep't of Educ.*, 32 F. Supp. 3d 405, 421 (E.D.N.Y. 2014) (finding IEP not reasonably calculated to ensure that bullying did not interfere with student's ability to receive a FAPE where IEP was "devoid of any indication that bullying was a problem for [student] or that harassment by her peers, unless properly addressed, was substantially likely to have a severely negative impact on her educational opportunities").

remedial or corrective action); *R.B. ex rel. L.B. v. Bd. of Educ. of City of N.Y.*, 99 F. Supp. 2d

411, 419 (S.D.N.Y. 2000) (denying motion to dismiss in light of, *inter alia*, hearing officer's

finding that "defendants' conduct was tantamount to gross neglect, incompetence and ineptitude

which has had a very serious . . . adverse impact on the student's chance at getting any kind of

satisfactory education") (internal quotation marks omitted).

### C.    State Law Claims

Against the individual defendants, the AC brings (1) claims under the NYSHRL,

NYCHRL, and New York Civil Rights Law; and (2) common law negligence claims.  Against

DOE and BOE, the AC brings (1) claims under the NYSHRL and NYCHRL; and (2) common

law negligence claims.  Defendants move to dismiss a subset of these claims—all claims against

the individual defendants, and the negligence claims against DOE and BOE[13]—on state law

immunity grounds.

Defendants' immunity argument is summarized as follows:  New York common law

immunizes state and local employees from liability for claims arising out of their exercise of

purely discretionary acts.  *See Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999) (citing

*Tango v. Tulevech*, 61 N.Y.2d 34, 40 (App. Div. 1983)).  The teachers and administrators at I.S.

---

[13] Defendants do not seek dismissal of the state law statutory claims against DOE and BOE.  *See* Reply at 9 (arguing that cases Cianciotto cited in opposition brief are inapt because they regard the liability of "schools," whereas "Defendants do not argue that DOE may not be named as a Defendant in this action—only that the individually-named Defendants should not be."); Mot. at 11 ("The *individual defendants* are immune from liability under state law.") (emphasis added). Nonetheless, at various points defendants have suggested that DOE and BOE are entitled to a kind of derivative immunity based on the individual defendants' immunity.  *See, e.g.*, Mot. at 11 ("The individually-named Defendants are entitled to absolute immunity from Plaintiffs' state law claims. . . . This protection extends to the state itself as well as its subdivisions.") (internal quotation marks omitted); Dkt. 43 (similar position in letter regarding Cianciotto's negligence claims).  Because the Court below rejects the argument that the individual defendants may be held immune based on the pleadings, the point, at this stage, is academic.

126Q exercised a purely discretionary function in responding to D.S.'s bullying, as student discipline is a highly fact-specific endeavor from which courts should refrain second guessing. *See Davis*, 526 U.S. at 648. Therefore, the individual defendants are absolutely immune from any claims arising out of their response to D.S.'s bullying—which happens to include all of the claims here.

To the extent defendants claim absolute immunity, it is unavailable. As to the statutory claims, courts have recognized the potential for employee liability. *See Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 198 (S.D.N.Y. 2004) ("The Second Circuit has concluded that 'a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable' under the NYSHRL.") (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)); *Lee v. N.Y. State Dep't of Health*, No. 98 Civ. 5712 (RMB) (HBP), 2001 WL 34031217, at *11 (S.D.N.Y. Apr. 23, 2001) (recognizing that personal liability for state employees exists for discrimination claims under the NYSHRL and NYCHRL); *McGrath v. Arroyo*, No. 17 Civ. 1461, 2019 WL 3754459, at *13 (E.D.N.Y. Aug. 8, 2019) ("[F]acts sufficient to sustain a cause of action under [the NYSHRL] will support a cause of action under [the NY Civil Rights Law].") (citing *Hyman v. Cornell Univ.*, No. 15 Civ. 792, 2017 WL 1194231, at *10 (N.D.N.Y. Mar. 30, 2017), *aff'd*, 721 F. App'x 5 (2d Cir.) (summary order)). To the extent the individual defendants might otherwise have been entitled under the common law to absolute immunity, the New York legislature has preempted it in connection with claims under these statutes. *See, e.g., Hiller v. Cnty. of Suffolk*, 81 F. Supp. 2d 420, 423 (E.D.N.Y. 2000) (holding that, notwithstanding immunity doctrine, "since the [NYSHRL] does not exempt the state and its officials from its coverage, the statute contemplates imposition of liability on them" for acts of discrimination undertaken in bad faith or without reasonable basis); *Barnes v.*

*Nassau Cnty.*, 108 A.D.2d 50, 54 (N.Y. App. Div. 1985) ("It would be anomalous, to say the least, for the Legislature to impose on the county such a duty, which could be performed by other entities, and then for courts to preclude inquiry into the discharge of those duties, even if resulting from negligence or malice.") (citing *Rottkamp v. Young*, 21 A.D.2d 373 (N.Y. App. 1964)).

And as to the negligence claims, courts have recognized their availability against public employees and state subdivisions, too. *See, e.g.*, *Mon v. City of New York*, 78 N.Y.2d 309, 315 (1991) ("Concededly, there may be some acts . . . which, if isolated from the rest, could . . . support a claim for negligence."); *Barnes*, 108 A.D.2d at 54 ("[A] State or its subdivisions may be answerable for injuries suffered by children as a result of negligence in the placement or supervision of children in their charge."); *Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 06 Civ. 15509 (WWE), 2011 WL 1079944, at *10 (S.D.N.Y. Mar. 24, 2011) ("Qualified immunity cannot protect [principal] or the School District on [negligent supervision] claim. Courts in New York have held that a claim for negligent supervision may go forward in a school context because of the nature of a school's special duty owed to its pupils."). Thus, defendants' immunity—if any—would be qualified, not absolute. Defendants have not pointed to any contrary authority.[14]

---

[14] Insofar as the claims against BOE and DOE, in particular, require the additional showing of a "special relationship" owed to D.S. to survive, *see Gotlin v. City of New York*, 90 A.D.3d 605, 607 (N.Y. App. Div. 2011) ("[A] municipality is immune from negligence claims arising out of the performance of its governmental functions unless the injured person establishes a special relationship with the municipality which would create a special duty of protection with respect to that individual."), such a special relationship is pled to exist. *See Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976) ("It is clear that a school district does have a special relationship to its students, as that term is used in the negligence context."). That relationship in mind, courts have routinely recognized the viability of negligence claims against school districts. *See, e.g., Mirand v. City of New York*, 84 N.Y.2d 44, 49 (1994) ("Schools are under a duty to adequately supervise the

Whether defendants would be entitled to qualified immunity under New York state law turns on whether their allegedly discretionary actions were "undertaken in bad faith or without reasonable basis."[15] *Hiller*, 81 F. Supp. 2d at 423 (citing *Arteaga v. State*, 72 N.Y.2d 212, 216–17 (1998)); *see also Russell v. Westchester Comm. Coll.*, No. 16 Civ. 1712 (KMK), 2017 WL 4326545, at *13–14 (S.D.N.Y. Sept. 27, 2017) ("Qualified immunity—unlike absolute immunity—is negated by bad faith or the lack of any reasonable basis for the action.") (quotation omitted); *see also Lore v. City of Syracuse*, 670 F.3d 127, 167 (2d Cir. 2012) ("[A] factual finding as to whether [an individual defendant] had acted in good faith . . . [is] essential to his state-law defense of qualified immunity on the [NYSHRL] claim."); *Arteaga*, 72 N.Y.2d at 216 (in action against state, distinguishing absolute immunity from "qualified immunity, shielding the government except when there is bad faith or the action taken is without a reasonable basis"); *Hiller*, 81 F. Supp. 2d at 422 (discussing common-law immunity for discretionary acts and noting that *Arteaga* "involved the municipality's immunity").

---

students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision."); *Bliss*, 2011 WL 1079944, at *10 ("Courts in New York have held that a claim for negligent supervision may go forward in a school context because of the nature of a school's special duty owed to its pupils."); *Shea v. Union Free Sch. Dist. of Massapequa*, No. 06-17706, 2009 WL 493503 (N.Y. Sup. Ct. Jan. 6, 2009) ("C.S. has adequately pled a claim for negligent supervision as she alleges that the School District had notice of the students' and teachers' behavior which led to her injuries for years yet took inadequate or no action at all.").

[15] The AC pleads only discretionary—as opposed to "ministerial"—actions or omissions. Government employees who fail to adhere to a ministerial duty, which encompasses those "functions and duties [that] are essentially clerical or routine," do not enjoy even qualified immunity. *Mon*, 78 N.Y.2d at 31; *see also Lauer v. City of New York*, 95 N.Y.2d 95 (2000) (recognizing distinction in context of claims against municipality where based on employees' negligence). Although discovery may reveal that a defendant or defendants failed to adhere to ministerial duties at discrete moments, the AC does not allege lapses of this nature. It alleges only instances in which defendant(s) responded to situations that called for the "exercise of reasoned judgment which could typically produce different acceptable results," *i.e.*, made discretionary decisions. *Tango*, 61 N.Y.2d at 41.

Having already found that Cianciotto has adequately alleged deliberate indifference, it follows that defendants' actions, as pled, lacked a reasonable basis. *Cf. Ross v. Correct Care Sols., LLC*, No. 11 Civ. 8542 (DLC), 2013 WL 5018838, at *6 (S.D.N.Y. Sept. 13, 2013) ("As the Court has already concluded that the conduct that the plaintiff alleges as to [individual defendant] is sufficient to state a claim for deliberate indifference, it follows, *a fortiori*, that the plaintiff's allegations of . . . gross negligence are adequately pled."). As pled, school officials, on notice of D.S.'s vulnerability, fecklessly and frequently chose not to protect him. They allegedly left D.S. vulnerable to harassment, despite repeated warnings from D.S. and Cianciotto that the school's approaches were not working and even backfiring. As IHO Wolman found in a decision incorporated by the AC, "the school went so far as to blame the Student for making himself a target of the bullying," resulting in his "substantial emotional, behavioral and social regression." IHO Decision ¶¶ 233–34; *see generally supra* Section III.A.3.

The AC therefore plausibly pleads a failure to reasonably respond to the bullying, of a degree that negates the qualified immunity the defendants might otherwise enjoy. On similar pleadings, courts have allowed claims to proceed past the pleadings. *See, e.g.*, *Pratt*, 803 F. Supp. 2d at 150 (denying motion to dismiss New York Civil Rights Law claims where complaint adequately alleged individual school and district employees subjected student to discrimination on the basis of sex and sexual orientation); *Tesoriero*, 382 F. Supp. 2d at 401–02 (finding triable issues of fact regarding harassed student's negligence claim against school district premised on assistant principal's alleged failure to intervene to protect student).

That said, the Court is cognizant that discovery may reveal nuances in each individual defendant's response to D.S.'s bullying that may absolve them of liability, in whole or part. Accordingly, although the Court declines to grant the motion to dismiss on the basis of qualified

immunity, it invites defendants "to renew their claims for qualified immunity should they file a motion for summary judgment on a more fully developed record." *Russell*, 2017 WL 4326545, at *14 (citing *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004) ("[A] qualified immunity defense can be presented in a [motion to dismiss], but . . . the defense faces a formidable hurdle when advanced on such a motion.")); *see also Mon*, 78 N.Y.2d at 313–14 (engaging in a "functional analysis of the actor's position" to determine whether "it is sufficiently discretionary in nature to warrant immunity" and, if so, "whether the conduct giving rise to the claim is related to an exercise of that discretion").

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss in its entirety. The Clerk of Court is respectfully directed to terminate the motion at docket entry 31. The parties are instructed to file on the docket of this case, by April 29, 2022, a revised case management plan providing for full discovery to proceed.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: April 22, 2022
      New York, New York